IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| SONDA JONATHAN MADUHU,<br>*Plaintiff* | §§§§§§§§§ | |
| -vs- | | SA-23-CV-00142-XR |
| HEIDI ANDREA MADUHU,<br>*Defendant* | | |

**ORDER**

Before the Court in this Hague Convention case is Petitioner Sonda Jonathan Maduhu's Original Petition and Request for Return of Minor Children (ECF No. 1), in which Petitioner seeks the return of his two minor children, R.A.M. and M.H.M., to the United Kingdom. After careful consideration of the Petition, Respondent Heidi Andrea Maduhu's First Amended Answer (ECF No. 18), as well as the arguments and evidence presented at the consolidated injunction and merits hearing held on April 11, 2023, the Court issues the following order.

**BACKGROUND**

This case arises under the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention" or "Convention"), Oct. 24, 1980, T.I.A.S. No. 11670, S. Treaty Doc. No. 99-11, and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 *et seq*. The Hague Conference on Private International Law adopted the Convention in 1980 to address the problem of international child abductions during domestic disputes, such as the one at issue in this case.

Petitioner Sonda Jonathan Maduhu initiated this action to secure the return of his minor children, R.A.M. and M.H.M. (the "Children"), who were allegedly removed from the United Kingdom without Petitioner's consent or acquiescence by the Children's mother, Respondent

Heidi Andrea Maduhu. ECF No. 1 (Verified Petition for Return of Minor Children to Their Habitual Residence, hereinafter "Original Petition"); ECF No. 2 (First Amended Verified Petition for the Return of Minor Children to Their Habitual Residence, hereinafter "Amended Petition").

R.A.M. and M.H.M. were born on August, 7, 2015 and May 16, 2018, respectively, in the United Kingdom, where they lived with their parents until their removal to the United States. ECF No. 1 ¶ 11; ECF No. 1-2 (birth certificates).

Petitioner alleges that he and Respondent agreed that the Children would travel with Respondent to Texas in December 2021, for a visit over the Christmas holidays with her family and to give Respondent the opportunity to have a pre-existing medical condition evaluated by experts in Texas. ECF No. 1 ¶ 14. According to Petitioner, the parties intended for the Children to return to the United Kingdom after the Christmas holiday in time for R.A.M. to resume his schooling on January 6, 2022. *id.* Respondent requested some additional time in the United States, and Petitioner confirmed with the school headmaster that R.A.M. could return to his school no later than February 25, 2022. *Id.* The tickets for Respondent and the Children to return to the United Kingdom were purchased on February 1, 2022. *Id.* They were expected to board a flight that would depart San Antonio, Texas on February 22, 2022, and arrive in London, England on February 23, 2022. *Id.*

On February 23, 2022, however, Respondent wrote to R.A.M.'s headmaster to inform him that she and the Children had not boarded the flight to London and had no plans to return to the United Kingdom. *Id.* ¶ 15. Over the next few months, Petitioner asserts that he made "every effort to convince Heidi to return the Children to the UK, including making a trip to Texas to meet with her and visit the Children in September and October 2022—all to no avail." *Id.* He then began the process of preparing his application under the Hague Convention.

Respondent is currently residing at the home of her mother, Sabrina C. Bishop-Smith, and stepfather, Greg Smith, located at 1106 Tranquil Trail Dr., San Antonio, Texas. ECF No. 1 ¶ 2. She is believed to be working at the business of her brother, Carl Bishop, AE Realty, The Bishop Group, 16410 Blanco Rd. Ste. 2, San Antonio, Texas. *Id.*

Petitioner's Original Petition and Amended Petition were filed on February 3, 2023. ECF Nos. 1, 2. The Court entered an order granting Petitioner's *ex parte* motion for a temporary restraining order ("TRO") prohibiting Respondent, her agents, and all persons acting in concert with her from removing the Children from the geographic jurisdiction of this Court pending further order of this Court or another United States court or agency. ECF No. 6. The Court set the request for a preliminary injunction for a hearing, and ordered Respondent to appear, with the Children, and show cause why the TRO should not be extended beyond its February 24, 2023 expiration date and why the Children should not be returned to the United Kingdom. *Id.* at 9.

On April 11, 2023, the Court held a consolidated injunction and merits hearing at which the parties appeared and presented arguments concerning the propriety of the Children's return to the United Kingdom. *See* FED. R. CIV. P. 65(a); *John v. State of La. (Bd. of Trs. for State Colleges & Univs.)*, 757 F.2d 698, 704 (5th Cir. 1985). Petitioner appeared remotely at the hearing by videoconference. Respondent appeared in-person, along with the director of the children's program at Wayside Chapel, Belva Stringer, and Respondent's mother, Sabrina Bishop, with whom Respondent and the Children have been living since their arrival in the United States.

## DISCUSSION

Rule 65(c) allows the Court to "issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Included in the Court's discretion when setting a security bond is the ability to "require no security at all." *A.T.N. Indus., Inc. v. Gross*, 632 F. App'x 185, 192 (5th Cir. 2015) (quoting *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)).

**I.     Findings of Fact**

1. On December 13, 2021, Respondent and the Children traveled from the home they shared with Petitioner in the United Kingdom to San Antonio, for a visit over the Christmas holidays with Respondent's family and to give Respondent the opportunity to have a pre-existing medical condition evaluated by experts in Texas. PEX 11 at 1.

2. While the tickets to San Antonio were purchased by Respondent's brother, Karl Bishop, it is clear that Petitioner consented to the holiday in the United States. Petitioner drove Respondent and the Children to Heathrow Airport.

3. Respondent had recently suffered from a mental breakdown resulting in a state of psychosis, which affected her ability to remember some of the events surrounding her departure from the United Kingdom. Nonetheless, she recalled telling Petitioner at Heathrow that she might not return, saying, "I need to be away until I am well, and I may potentially not return."

4. Both parties testified that Petitioner expected the Children to return to the United Kingdom on January 6, 2022. Respondent informed Petitioner that she was not ready to return at that time due to ongoing medical appointments. *See* PEX 24.

5. On January 25, 2022, Petitioner received a letter from the headmaster of the Children's school in the United Kingdom, St. Joseph's Catholic Primary School, informing Petitioner that, in order to remain enrolled at the school, R.A.M. would need to return by February 25. *See* PEX 14 at 1. Petitioner forwarded the letter to Respondent, informing her that they had another 32 days in which to return the Children to school.

6.   Petitioner purchased return tickets for Respondent and the Children departing on February 22, 2022. *See* PEX 11 at 15–19. They never boarded the plane. Respondent informed Petitioner of her decision not to return to the United Kingdom with the Children. *See* PEX 12 at 2.

7.   Since their wrongful retention in the United States, Petitioner has continuously and diligently sought the return of the Children to the United Kingdom through formal and informal means. Respondent testified at the hearing that, in her phone calls and WhatsApp messages with Petitioner, he was "always" saying "return the children, return the children." *See also* PEX 12 (Feb. 25, 2022 email from Petitioner to Peter Coldwell, headmaster of St. Joseph's, stating "I continue to pray for the return of my wife and children to the UK."); PEX 15 (Sept. 5, 2022 email from Petitioner to Coldwell, stating, "[I]t is my intention for both [Children] to return to St. Joseph's as I continue to desperately seek the return of my family to the UK.").

8.   Petitioner has maintained contact with his Children for one hour per week over Zoom. Both parties testified that Petitioner paid child support until February 2023, when he was unable to pay child support due to the legal fees associated with his petition under the Hague Convention and this lawsuit.

9.   In March 2022, Petitioner sent Respondent an email with copies of the Children's immunization records from the United Kingdom. Petitioner acknowledged at the hearing that he knew Respondent intended to use the immunization records to enroll the Children in school in the United States. He testified he had initially refused to provide the immunization records because he worried that it would be interpreted as consent to enrolling them in school and as acquiescence to their continued retention in the United States. He ultimately sent the documents to Respondent, however, after she restricted access to the Children, because he feared losing access to the Children entirely.

10.     The Children have been enrolled at The Christian School at Castle Hills since the beginning of the 2022 school year. REX 2 at 1. Both Children have participated in the children's ministry at the Wayside Chapel on a weekly basis since their arrival in the San Antonio, *see* REX 1 at 1, and Respondent testified at the hearing that R.A.M. has attended weekly Trail Life meetings for approximately six to nine months.[1]

11.     In late-September and early-October 2022, Petitioner traveled to San Antonio to visit Respondent and the Children, seeking to resolve the situation amicably through multiple attempts at religious counseling and mediation. These attempts at resolution were ultimately unsuccessful, however, and Petitioner filed his in application under the Hague Convention on November 29, 2022, ECF No. 1-1 at 17, ultimately resulting in the filing of his complaint in this action on February 3, 2023, ECF No. 1.

## II.     Conclusions of Law

### A.     The Hague Convention and ICARA

The Hague Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." ECF No. 3-1, Treaty Doc., Art. 1. It accomplishes these objectives through the return remedy. *Sanchez v. R.G.L.*, 761 F.3d 495, 503 (5th Cir. 2014) (citing *Abbott v. Abbott*, 130 S. Ct. 1983 (2010)). The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. *Abbott*, 130 S. Ct. at 1995. Ordering a return remedy does not alter the exiting allocation of custody rights, but

---

[1] At the hearing, Respondent described Trail Life as a Christian alternative to the Boy Scouts of America.

does allow the courts of the home country to decide what is in the child's best interests. *Id.* As the Supreme Court explained in *Abbott*:

> The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. A removal is "wrongful" where the child was removed in violation of "rights of custody." The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence.

*Id.* at 1989 (citations omitted). "By focusing on the child's return, the Convention seeks to 'restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court.'" *Sanchez*, 761 F.3d at 503 (citing *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000)). The return remedy determines the country in which the custody decision is to be made; it does not make that custody decision. *Id.*

ICARA implements the Hague Convention by authorizing a person who seeks a child's return to file a petition in state or federal court and directing courts to "decide the case in accordance with the Convention." 22 U.S.C. § 9003(a), (b), (d). Suit should be filed in a court in the jurisdiction where the child is physically located. *Id.* (b). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," ICARA provides that the child shall be "promptly returned," unless one of a number of narrow exceptions applies. *Id.* § 9001.

The retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the child was retained somewhere other than the child's habitual residence; (2) the retention was in breach of the petitioner's rights of custody under the laws of the country of

habitual residence; and (3) the petitioner was exercising those rights at the time of retention. Hague Convention arts. 3, 12.

The Hague Convention also provides that if the child's removal or retention is deemed wrongful and "the date of the commencement of the proceedings" before the court where the child is located is "less than one year" from the date of the removal or retention, the court "shall order the return of the child forthwith." Hague Convention art. 12. Even if it has been longer than one year, the court "shall also order the return of the child[ ], unless it is demonstrated that the child is now settled in its new environment." *Id.* "ICARA requires the abducting parent to establish by a preponderance of the evidence that Article 12's exception to return applies." *Lozano v. Montoya Alvarez*, 572 U.S. 1, 6 (2014) (citing 42 U.S.C. § 11603(e)(2)(B)).

Respondents in Hague Convention cases may assert "several narrow affirmative defenses to wrongful retention." *Larbie v. Larbie*, 690 F.3d 295, 308 (5th Cir. 2012). Specifically, they may argue that (1) return of the child would pose a grave risk of physical or psychological harm, (2) return would violate the returning country's fundamental principles relating to the protection of human rights and fundamental freedoms, (3) judicial proceedings were commenced at least one year after the date of retention and the child is now settled into the new environment, (4) the child has reached a sufficient age and level of maturity and objects to return, and/or (5) the petitioner seeking return of the child had consented to or subsequently acquiesced to the removal or retention. *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 575 (W.D. Tex. 2013).

**B.     Analysis**

At the hearing, Respondent conceded that Petitioner's complaint stated a prima facie case that the Children had been wrongfully retained in the United States but presented two affirmative defenses, asserting that Petitioner had acquiesced to the Children's removal and that the Children

were now well settled in their new environments such that they should not be returned to the United Kingdom. The Court will address each argument in turn.

### 1. Whether Petitioner acquiesced to the Children's removal

Under Article 13(a), the consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention. *Larbie*, 690 F.3d at 308 (citing *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005)). The respondent must prove the defense of consent or acquiescence to the removal or retention by a preponderance of the evidence. 42 U.S.C. § 11603(e)(2). The affirmative defenses are narrowly construed to effectuate the purposes of the Convention, and even finding an exception under article 13 does not automatically preclude an order of return. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996). Generally, courts "'liberally find'" that rights of custody have been exercised unless evidence demonstrates "acts that constitute clear and unequivocal abandonment of the child." *Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344–45 (5th Cir. 2004) (citation omitted).

When examining an acquiescence defense, "'each of the words and actions of a parent during the separation are not to be scrutinized for a possible waiver of custody rights.'" *Gallardo v. Orozco*, 954 F. Supp. 2d 555, 577 (W.D. Tex. 2013) (citing *Simcox v. Simcox*, 511 F.3d 594, 603 (6th Cir. 2007) (quoting *Friedrich*, 78 F.3d at 1069)). Furthermore, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time." *Friedrich*, 78 F.3d at 1070; *see also Velasquez v. Green*, No. 4:12–CV–66, 2012 WL 2885662, at *5 (E.D. Tex. July 13, 2012); *De*

*Vasconcelos v. De Paula Batista*, No. 4:10–CV–00628, 2011 WL 806096, at *7 (E.D. Tex. March 1, 2011).

Petitioner's weekly calls with the Children and his visit to San Antonio do not constitute acquiescence. *Vazquez v. Estrada*, No. 3:10–CV–2519–BF, 2011 WL 196164 (N.D. Tex. Jan. 19, 2011) (unpersuaded by the father's assertion that the mother had acquiesced to the removal of the child because she sent several e-mails intended for the child without demanding that the child return to Mexico); *Khalip v. Khalip*, No. 10-13518, 2011 WL 1882514, at *7 (E.D. Mich. May 17, 2011) ("Petitioner's visits to Michigan and communication over email and through video chat fails to demonstrate that he acquiesced in the removal."). Nor does his provision of child support and their immunization records. *Lyon v. Moreland-Lyon*, No. 12–2176–JTM, 2012 WL 1970363 (D. Kan. 2012) (observing the father's testimony that he looked at the school and ultimately enrolled the child there so that the child could benefit from the opportunities the school provided only showed that the father was trying to do the best for the child despite the couple's marital problems, not that he acquiesced to the child's removal). To hold otherwise would require petitioning parents to jeopardize their children's welfare—by refusing to provide financial support, medical records and consents, and information required for school enrollment—in order to prove that they had not acquiesced to their children's removal to the United States.

Indeed, the Court is not convinced that Petitioner ever made a statement or committed an act with the required formality to acquiesce. Rather, the record demonstrates that Petitioner diligently sought the return of the Children in Spring 2022 so that they could finish the school year in the United Kingdom. *See Gallardo*, 954 F. Supp. 2d at 578 (reasoning that petitioning mother's text messages to the responding father about when the child was scheduled to begin school in Mexico and when the child needed to be returned "reveal[ed] a speedy attempt and diligent effort

10

to regain G.G."). At the hearing, Respondent testified that Petitioner has continuously sought the Children's return in every communication she has had with him since February 2022, when they failed to board their return flight to the United Kingdom. Petitioner's communications—both with Respondent and with the Children's school in the United Kingdom—confirm that he has consistently pursued the return of the Children. *See* PEX 15. Indeed, Respondent acknowledged as much at the hearing, testifying that Petitioner was "always" saying "return the children, return the children." When those methods failed, he persisted in his efforts to secure the return of the Children, ultimately, pursuing this legal action against Respondent. *Gallardo*, 954 F. Supp. 2d at 578.

Accordingly, the Court concludes that Respondent has failed to establish by a preponderance of the evidence that Petitioner acquiesced to the Children's retention in the United States.

**2.   Whether the children are well settled in their new environment**

Respondent's answer asserts that the children should not be returned to the United Kingdom because they have lived in the United States for over a year and are well-settled in their new environment. *See* ECF No. 18 at 2. To begin, the Court is not convinced that this defense is even available to Respondent. While the Children have lived in the United States for over a year, they were not wrongfully retained until February 22, 2022, when they failed to board their return flight to the United Kingdom. Accordingly, Petitioner's complaint, which was docketed on February 3, 2023, was filed well within the one-year period after their wrongful retention as contemplated under the Hague Convention. Hague Convention art. 12; *Lozano v. Montoya Alvarez*, 572 U.S. 1, 16 (2014) ("Article 12 explicitly provides that the 1–year period commences on 'the date of the wrongful removal *or retention*[.]'") (emphasis added).

11

Even considering the bases for the well-settled defense in this case, however, the Court is not convinced that the Children are so well settled in their new environment that they should remain in the United States. In making this determination, courts in the Fifth Circuit consider: (1) the child's age; (2) stability and duration of the child's residence in new environment; (3) whether the child attends school or day care consistently; (4) whether the child has friends and relatives in the new area; (5) the child's participation in community or extracurricular activities; (6) respondent's employment and financial stability; and (7) the immigration status of respondent and child. *Hernandez v. Garcia Pena*, 820 F.3d 782, 788 (5th Cir. 2016).

First, the Court considers the Children's ages. Here, R.A.M. is seven years old, and M.H.M. is nearly five years old. In other words, the children are fairly young and unable to form the same level of attachments and connections to a new environment as an older child. *See Hernandez v. Garcia Pena*, 820 F.3d 782, 789 (5th Cir. 2016) (concluding that a six year-old child was too young to form significant connections) (citing *Lozano*, 697 F.3d at 48 (noting that the district court found the five-year-old child "too young to form certain types of connections")); *cf. Alcala v. Hernandez*, No. 4:14-CV-04176-RBH, 2015 WL 4429425, at *1 (D.S.C. July 20, 2015), *aff'd* 826 F.3d 161 (4th Cir. 2016) (child who had been wrongfully removed from Mexico at the age of eight had formed strong connections in the United States when the district court denied his father's Hague petition approximately two years later).

The second factor is the stability and duration of the children's new residence. Although the Children's residence in their grandparents' home appears to be stable, they have lived in San Antonio for little more than a year. *Cf. Alcala*, 2015 WL 4429425, at *1 (child who had been wrongfully removed from Mexico at the age of eight had formed strong connections in the United States when the district court denied his father's Hague petition nearly two years later).

The third and fourth factors consider whether the children attend school consistently and have friends and relatives in the new environment. Respondent testified that both children attend The Christian School at Castle Hill, where R.A.M. has excelled academically.[2] *See also* REX 2 at 3; REX 7; REX 8. The Children live with Respondent and her mother and stepfather at their home in San Antonio. The also frequently spend time with Respondent's brothers.

The fifth factor addresses the Children's participation in community activities. Both Children have participated in the children's ministry at the Wayside Chapel since their arrival in San Antonio, and R.A.M. has been a member of Trail Life for approximately six to nine months. *See* REX 1 at 1.

As to the sixth factor, Respondent did not offer any testimony at the hearing as to her economic and employment stability, although she did reference her family's real estate business on multiple occasions.

Finally, the seventh factor—immigration status—does not cut in either direction. Respondent is a citizen of both the United States and the United Kingdom, but there was no testimony as to the citizenship status of the Children. *See* PEX 7 (Respondent's Certificate of Naturalisation in the United Kingdom); PEX 19 at 4 (voter registration information for both parties).

Balancing the above factors, the Court is not persuaded that Respondent has met her burden of establishing that the Children have formed significant connections to their new environment such that they should remain in the United States. The standard does not call for determining in which location a child is relatively better settled but rather for determining whether the child has become so settled in a new environment that repatriation would be against the child's best interest.

---

[2] It is worth noting that, while Respondent has enrolled the Children in school in San Antonio, they missed several months of school in Spring 2022 due to their wrongful retention in the United States.

*In re Filipczak*, 513 F. App'x 16 (2d Cir. 2013). Thus, the Court concludes that the Children are not well-settled and, accordingly, that the Convention mandates their return to the United Kingdom.

## CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that the relief requested in the Petition (ECF Nos. 1, 2) is **GRANTED**. R.A.M. and M.H.M. are to be promptly and safely returned to the United Kingdom. To be clear, nothing in this order should be read to constitute a final or permanent award of physical or legal custody over the children, which is a determination that must be made in the United Kingdom upon their return. *Abbott*, 560 U.S. at 8–9; *Sanchez*, 761 F.3d at 503. The parties are **DIRECTED** to meet and confer to determine when and in what manner the Children will be returned to the United Kingdom, and to provide a joint advisory as to their plan for the return of the Children **no later than May 18, 2023**.

**IT IS FURTHER ORDERED** that within 30 days after R.A.M. and M.H.M. have been returned to Petitioner, Petitioner may submit a motion for costs and fees, accompanied by a final list of his incurred expenses, including attorneys' fees, court costs, and transportation costs related to the return of R.A.M. and M.H.M. *See* 42 U.S.C. § 11607(b)(3). Should Petitioner file such a motion, Respondent may respond within 14 days or seek an extension of time in which to do so.

It is so **ORDERED**.

**SIGNED** this 18th day of April, 2023.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE